**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **STACEY TATROE,** | |
| **Plaintiff,** | |
| **v.** | **1:04-cv-1074-WSD** |
| **COBB COUNTY, GEORGIA, et al.,** | |
| **Defendants.** | |

**ORDER**

This is a Section 1983 action in which Plaintiff Stacey Tatroe ("Plaintiff")
alleges her former employer (Defendant Cobb County) and her former supervisors
(Defendants Wheeler, Flynn and Rogers) retaliated against her for constitutionally
protected speech in violation of the First and Fourteenth Amendments.  It is before
the Court on Defendants' Motion for Summary Judgment [27], Plaintiff's Motion
to Exceed Page Limit [35] and Defendants' Motion to Exceed Page Limit [51].[1]

---

[1]  Plaintiff and Defendants request permission to file response and reply
briefs that exceed the 25-page limit provided by this Court's Local Rules.  For
cause shown, Plaintiff's and Defendants' requests are GRANTED *NUNC PRO
TUNC*.

# I.    BACKGROUND

## A.    Factual Background

The following facts are deemed to be undisputed for the purpose of Defendants' Motion for Summary Judgment.  Unless otherwise indicated, these facts are drawn from Defendants' Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried ("Defendants' Statement of Material Facts") [27] and Plaintiff's Statement of Material Facts As To Which There Are Genuine Issues To Be Tried ("Plaintiff's Statement of Material Facts") [35].  See L.R. 56.1(B)(2), N.D. Ga.  Where Plaintiff does not directly refute a material fact set forth in Defendants' Statement of Material Facts with specific citations to evidence, or otherwise fails to state a valid objection to the material fact pursuant to Local Rule 56.1(B)(2), such fact has been deemed admitted by Plaintiff.  See id. at 56.1(B)(2).  Because Defendants did not file a response to Plaintiff's Statement of Material Facts, the additional material facts set forth in it are deemed to be admitted by Defendants.  See id. at 56.1(B)(3).  In all instances, the Court views the evidence and factual inferences in the light most favorable to Plaintiff, as required on a motion for summary judgment.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587 (1986); <u>McCabe v. Sharrett</u>, 12 F.3d 1558, 1560 (11th Cir. 1994); <u>Reynolds v. Bridgestone/Firestone, Inc.</u>, 989 F.2d 465, 469 (11th Cir. 1993).

The Cobb County 911 Communications Bureau (the "Bureau") is a branch of the Cobb County Department of Public Safety.  Within the Bureau, emergency communications operators report to shift supervisors, who report to lead supervisors, who report to the Assistant Manager, who reports to the Manager. The Bureau Manager is the top administrator within the Bureau.  He or she reports to the Director of the Department of Public Safety, who reports to the County Manager, who in turn reports to the Board of Commissioners.  The Board of Commissioners (the "Board") is the governing body of Cobb County.

Joe Lee Thompson currently serves on the Board as Commissioner for District Two.  Since January 2003, Commissioner Thompson has been designated to serve as the Board's representative with respect to the Department of Public Safety.  Mickey Lloyd has served as Director of the Department of Public Safety since February 2003.  Tony Wheeler ("Wheeler") is the current Bureau manager, and has served in this capacity since 1999, with the exception of time spent performing military service in Afghanistan from July 2002 through August 2003.

During Wheeler's absence, Ann Flynn ("Flynn") served as acting Bureau Manager and Bonnie Rogers ("Rogers") served as acting Assistant Manager.  At all other times relevant to this action, Flynn served as the Assistant Manager and Rogers served as a lead supervisor within the Bureau.

Plaintiff began her employment with the Bureau as an emergency communications operator in 1996.  Prior to the events at issue in this litigation, she had received excellent performance evaluations and had not received any formal discipline.  On or about January 20, 2003, Plaintiff wrote a letter to Commissioner Thompson (the "Thompson Letter") expressing her concern regarding an alleged manpower crisis at the Bureau.  The letter was critical of Bureau management and stated that the alleged manpower shortage was placing the public, the police officers and firefighters served by the Bureau at risk.  Plaintiff copied a number of government officials on the Thompson Letter, including higher-level officials within the Bureau, such as then Manager Flynn, as well as officials within law enforcement agencies served by the Bureau, such as Lee New, then Cobb County Police Chief, Bobby Moody, Marietta Police Chief, and Rebecca Denlinger, Cobb County Fire Department Chief.  A few days later, the letter was forwarded to the Marietta Daily

Journal and parts of it were quoted in a January 26, 2003 article regarding the Bureau.  It is undisputed that Plaintiff did not forward the letter to the press.

Approximately one week later, Bureau Manager Flynn spoke with Plaintiff concerning the Thompson Letter.  Though she did not dispute the content of the Thompson Letter or Plaintiff's right to raise these issues with her supervisors, Flynn advised Plaintiff that the letter violated the Bureau's written "Chain of Command" Policy.  The policy provides that all employees are required to follow the supervisory chain of command when addressing department matters; in other words, under the policy, an employee with a grievance relating to a department matter must first attempt to resolve the issue with his or her immediate supervisor before raising the issue with higher-ranking Bureau officials or going outside the Bureau.  On February 4, 2003, Plaintiff received a so-called Critical Incident Reminder ("CIR") stating that her publication of the Thompson Letter to officials outside the Bureau without notifying her chain of command or advising them of its contents prior to dissemination violated the Chain of Command Policy.

Plaintiff alleges that she was subject to a host of disciplinary actions in the year and eight months following her publication of the Thompson Letter that, although ostensibly unrelated to the letter, were imposed by Bureau officials in

retaliation for the letter's comments concerning the manpower crisis at the Bureau. Each of these actions is addressed more fully in the Court's analysis of Defendant's motion for summary judgment.  Ultimately, Plaintiff resigned her employment with the Bureau on October 2004.  Although she contends that she had no choice but to leave the Bureau as a result of the various alleged disciplinary actions taken against her during 2003 and 2004, it is undisputed that she was not discharged or threatened with discharge by her superiors, and that she was not told to quit or encouraged to do so by her superiors or co-employees.

### B.    Procedural History

Plaintiff filed her Complaint on April 19, 2004 [1].  She asserts claims for First-Amendment retaliation under Section 1983 against Cobb County and against Wheeler, Flynn and Rogers (collectively, the "Individual Defendants") in both their individual and official capacities.[2]  Discovery was conducted and, on May 6, 2005,

_____

[2]  Plaintiff also asserts a claim under Georgia law for tortious interference with business relations, alleging that Defendants induced Plaintiff's prospective employer to deny her application for employment.  (Compl. ¶¶ 25-31.)  Defendants move for summary judgment on this claim on the grounds that Plaintiff cannot establish a prima facie case of tortious interference with business relations, and that, even if she could, Defendants are entitled to sovereign and official immunity with respect to this claim.  (Defs.' Mot. for Summ. J. at 27-30.)  Plaintiff in her response concedes that summary judgment is warranted on her claim for tortious interference

Defendants filed their Motion for Summary Judgment and Brief in Support ("Mot. for Summ. J.") [27].  Plaintiff filed her response in opposition to Defendants' motion on June 20, 2005 ("Opp'n to Mot. for Summ J.") [35], and Defendants filed their reply on July 12, 2005 ("Reply in Supp. of Mot. for Summ. J.") [52].[3]

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

_____

with business relations.  (Pl.'s Opp'n to Mot. for Summ. J. at 3 n.1) ("After reviewing Defendants' Motion for Summary Judgment, Plaintiff does not contest Defendants' Motion with respect to her tortious interference with business relations claim.").  Accordingly, Defendants' motion for summary judgment on this claim is GRANTED.

[3]  Plaintiff subsequently filed two notices of supplemental authority, requesting that the Court consider two Eleventh Circuit opinions issued after Plaintiff's summary-judgment response was filed [50, 55].  Because these opinions were not available when Plaintiff filed her summary-judgment response, and because Defendants did not object, Plaintiff's request for leave to file this supplemental authority is GRANTED.  The Court shall consider Plaintiff's supplemental case authority in deciding Defendants' Motion for Summary Judgment.

party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor.  United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### B.     Plaintiff's First-Amendment Retaliation Claim

"To state a claim for retaliation in violation of the First Amendment, a public employee must show that her employer retaliated against her because of her speech on a matter of public concern." Stavropoulos v. Firestone, 361 F.3d 610, 618 (11th Cir. 2004) (citing McCabe v. Sharrett, 12 F.3d 1558, 1564 n.3 (11th Cir. 1994)); see also Stavropoulos, 361 F.3d at 618 ("A public employer retaliates when he takes an adverse employment action that is likely to chill the exercise of constitutionally protected speech."). Here, Plaintiff alleges that Defendants retaliated against her because of the Thompson Letter, citing a host of employment actions taken against her between January 2003, when the letter was published, and October 2004, when she resigned from the Bureau. Defendants argue that summary judgment on Plaintiff's First-Amendment retaliation claim is warranted because (1) Plaintiff cannot demonstrate she suffered an adverse employment action in retaliation for constitutionally protected speech; (2) Cobb County is not liable under Section 1983 for the Individual Defendants' alleged conduct; and (3) the Individual Defendants are entitled to qualified immunity with respect to Plaintiff's claims against them in their individual capacities. The Court shall consider these arguments in turn.

1.     <u>Adverse Employment Actions</u>

The first step in assessing Plaintiff's claims is to determine which, if any, of the complained-of actions by Defendants constitute "adverse employment actions." "To be considered an adverse employment action in a First Amendment retaliation case, the complained-of action must involve an important condition of employment." <u>Stavropoulos</u>, 361 F.3d at 619.  Discharges, demotions, refusals to hire or promote, and reprimands involve important conditions of employment and therefore constitute adverse employment actions as a matter of law.  <u>Akins v. Fulton County, Ga.</u>, 420 F.3d 1293, 1300 (11th Cir. 2005).  "In addition, any other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee" qualifies as an adverse employment action. <u>Id.</u>  "In deciding whether employment actions are adverse, [courts] consider the employer's acts both individually and collectively."  <u>Id.</u> at 1301.

As in Title VII cases, however, not every action that makes an employee unhappy or that is likely to chill the employee's exercise of constitutionally protected speech satisfies the adverse employment action requirement. <u>Stavropoulos</u>, 361 F.3d at 618 ("[Plaintiff] argues that *any* action likely to chill the

employee' exercise of constitutionally protected speech satisfies the adverse

employment action requirement.  This standard is contrary to our precedents.");

Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1118 (11th Cir. 2001) ("[N]ot

everything that makes an employee unhappy is an actionable adverse employment

action.") (quoting Smart v. Ball State Univ., 89 F.3d 437 (7th Cir. 1996)). See

generally Stavropoulos, 361 F.3d at 619-20 (holding that the standards for adverse

employment action in First-Amendment retaliation cases and Title VII cases are

"consonant" and that the district court did not err in applying Title VII standards of

what is an adverse employment action to the plaintiff's First-Amendment retaliation

claim).  Instead, the plaintiff must show there has been some negative impact on an

important condition of her employment, such as her salary, title, position or job

duties.  See Akins, 420 F.3d at 1301-02; Stavropolous, 361 F.3d at 620-21.  The

requirement of a negative impact on an important condition of employment is

necessary "to avoid enmeshing federal courts in trivial employment matters," and to

ensure that an employee satisfies the injury-in-fact requirement of the federal

justiciability requirement.  See Stavropoulos, 361 F.3d at 620-21 ("[T]o satisfy

principles of justiciability, an employee complaining of First Amendment retaliation

must show more than her subjective belief that the employer's action was likely to

chill her speech:  she must show that the action had an impact on an important

aspect of her employment.").  Cf. Keenan v. Tejeda, 290 F.3d 252, 259 n.4 (5th

Cir. 2002) ("In the employment context, this court's requirement of an adverse

employment action serves the purpose of weeding out minor instances of

retaliation.") (citations omitted).

Plaintiff asserts the following actions constitute adverse employment actions,

either individually or collectively:

- The February 4, 2003 CIR Plaintiff received for violating the Chain of Command Policy with respect to the Thompson Letter;

- Flynn's February 14, 2003 letter to Plaintiff concerning the Thompson Letter;

- The March 15, 2003 CIR Plaintiff received for violating the Chain of Command Policy with respect to her request to meet with Director Lloyd;

- Rogers' inquiries regarding Plaintiff's communications with other employees regarding the March 2003 meeting for Bureau employees;

- Rogers' initial denial of Plaintiff's application for CPR instructor training in May 2003;

- Wheeler's failure to approve compensation for Plaintiff for several of the CPR classes she taught in August 2003 and September 2003;

- Rogers' September 2003 verbal warning and memo-to-file concerning Plaintiff's comments about former Bureau employee Danny MacDougal;

- The September 2003 letter of reprimand concerning Plaintiff's conduct in a counseling session with a trainee;

- Flynn's November 2003 verbal warning and memo-to-file concerning Plaintiff's negative comments about Bureau trainees;

- The December 2003 letter of reprimand concerning Plaintiff's comments at the Open Forum Meeting;

- Michelle Tate's comments regarding Plaintiff at a December 2003 meeting with Wheeler and other Bureau officials;

- Plaintiff's January 4, 2004 reassignment from the day shift to the night shift;

- Wheeler's prohibiting Plaintiff from working overtime on shifts supervised by Rogers from January 4, 2004, until late February 2004;

- Defendants' failure to select Plaintiff for the position of CPR instructor in the summer of 2004;

- Defendants' failure to select Plaintiff for the position of EMD instructor in the summer of 2004;

- The denial of Plaintiff's request for IT training in August 2004; and

- Plaintiff's alleged constructive discharge in October 2004.

(Pl.'s Opp'n to Mot. for Summ. J. at 4-7.)

Defendants concede that the September and December 2003 letters of reprimand issued to Plaintiff constitute adverse employment actions for the purpose of her First-Amendment retaliation claim. (Defs.' Mot. for Summ. J. at 5.) They argue the other miscellaneous conduct cited by Plaintiff, whether considered individually or collectively, does not rise to the level of an adverse employment action, and that Plaintiff's resignation in October 2004 did not constitute a constructive discharge. (Id. at 5-13.) The miscellaneous actions complained of by Plaintiff can be divided into three general categories: negative performance commentary (verbal warnings, memos-to-file, CIRs, etc.), denials of training or opportunities for or payment of additional compensation (IT training, EMD and CPR instructor positions, etc.), and alleged ultimate employment actions (Plaintiff's reassignment and alleged constructive discharge).

a.   *Negative Performance Commentary*

The verbal warnings, memos-to-file, CIRs, harsh words from Tate and alleged increased scrutiny Plaintiff received in 2003 and 2004 did not impact an important condition of her employment. Although Plaintiff alleges that verbal warnings and CIRs are part of the progressive discipline system in place at the Bureau, and that an employee who receives a large number of verbal warnings or

-14-

CIRs may be less likely to receive a promotion or may receive a smaller annual salary increase, it is undisputed that the admonishments Plaintiff received during 2003 and 2004 did not result in an ultimate employment action such as a demotion or discharge.  In addition, there is no evidence that they contributed to Plaintiff not being selected for a promotion or that she received a lower annual salary increase because these matters were part of her employment record with the Bureau.

Plaintiff argues that these actions nonetheless constitute adverse employment actions because, under the Eleventh Circuit's decision in Stavropoulos, any employer admonishment which can be construed as a "reprimand" is actionable as a matter of law.  (Pl.'s Opp'n to Mot. for Summ. J. at 7-8.)  Plaintiff's reliance on Stavropoulos is misplaced.  In that case, the court provided an illustrative list of acts which affect important conditions of employment, including "discharges, demotions, refusals to hire or promote, and reprimands."  Stavropoulos, 361 F.3d at 619.  The court did not elaborate on the circumstances under which a reprimand constitutes an adverse employment action, but held that the defendant university's conduct in publishing a memo criticizing the plaintiff for speaking out on a hiring decision, creating a file of negative performance evaluations, and disclosing the plaintiff's mental illness to the rest of the faculty, taken together or separately, did

not constitute adverse employment actions supporting a First-Amendment

retaliation claim because "they had no impact on an important condition of [the

plaintiff's job], such as her salary, title, position or job duties."  Id. at 620-21.

Thus, the decision reached by the court in Stavropoulos does not support

Plaintiff's argument that all admonishments which can be construed as

"reprimands" constitute adverse employment actions.  Instead, it stands for the

proposition that, to be actionable, Defendants' conduct must negatively impact an

important condition of Plaintiff's job.

      Plaintiff's argument is similarly undermined by the Eleventh Circuit's

decision in Akins.  In that case, the court stated that "[d]ischarges, demotions,

refusals to hire or promote, and reprimands involve important conditions of

employment and therefore constitute adverse employment actions as a matter of

law."  Akins, 420 F.3d at 1300.  Notwithstanding this broad language, the court

held that various verbal and written discipline imposed on the plaintiffs, including

unwarranted written reprimands, negative work evaluations, threats of termination,

threats of suspension without pay, exclusion from meetings, and removal of job

duties (followed by reprimands for not completing that work), did not constitute

adverse employment actions supporting a First-Amendment retaliation claim.  Id. at

-16-

1301-02.  The court reasoned that, even when considered in the aggregate, these actions did not negatively affect the terms and conditions of the plaintiffs' employment or their status as employees.  Id.

As in Stavropoulos and Akins, the various verbal and written negative performance commentary issued by Defendants, although "reprimands" in the strictest sense of the word, did not negatively affect the terms and conditions of Plaintiff's employment or her status as an employee.  Accordingly, the Court concludes that these actions, whether considered collectively or individually, do not constitute adverse employment actions.

        b.     *Denials of Training or Additional Opportunities for Additional Compensation*

Plaintiff asserts that she applied for, and was not selected for, the positions of EMD and CPR instructor in the summer of 2004.  It is undisputed that Plaintiff's selection for these positions would have resulted in additional compensation. Accordingly, the Court concludes that the failure to select Plaintiff for these positions constitutes an adverse employment action.  For the same reason, the Court finds Defendants' failure to compensate Plaintiff for several of the CPR

courses she taught in August and September 2003 also constitutes an adverse employment action.

However, Rogers' initial denial of Plaintiff's application for CPR instructor training in May 2003 and Defendants' denial of Plaintiff's request for IT training in August 2003 do not constitute adverse employment actions.  With respect to Rogers' initial denial of CPR instructor training, it is undisputed that Plaintiff appealed this initial denial to Wheeler, and that her request for training was ultimately approved.  An alleged adverse employment action, if rescinded before the employee suffers a tangible harm, is not an adverse employment action.  See Pennington v. City of Huntsville, Ala., 261 F.3d 1262, 1267 (11th Cir. 2001) ("[T]he decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action.").  With respect to Defendants' denial of Plaintiff's request for IT training, Plaintiff fails to provide support for her assertion that this denial involved an important condition of her employment.  See Harvey v. City of Bradenton, Fla., No. 804CV1748TEAJ, 2005 WL 3533155, *5 (M.D. Fla. Dec. 22, 2005) (rejecting the plaintiff's argument that denial of training requests constituted an adverse employment action for purposes of his First-Amendment retaliation claim: "Plaintiff does not provide any

legal support for the proposition that denial of training requests can constitute an adverse employment action. This conduct . . . does not affect Plaintiff's salary, title, position, or job duties. Neither does Plaintiff present any evidence that the training denied was an important condition of employment."). Plaintiff does not argue that this denial resulted in a change to her salary, title, position or job duties, nor does she offer any support for her vague argument that this denial "prevented her from advancing herself and her career within the Bureau." (Pl.'s Opp'n to Mot. for Summ. J. at 11.)

The Court also finds Wheeler's prohibition regarding working overtime shifts under Rogers' supervision does not constitute an adverse employment action. Wheeler reassigned Plaintiff to the night shift in January 2004, citing the friction between Plaintiff and Rogers, who supervised the day shift. In accordance with this reassignment, and the stated reasons for it, Wheeler prohibited Plaintiff from swapping shifts with employees who worked on shifts supervised by Rogers, and from working overtime on shifts supervised by Rogers. Plaintiff was not prohibited from working on shifts other than those supervised by Rogers, and this restriction lasted for only two months. Nevertheless, Plaintiff argues this prohibition constitutes an adverse employment action, alleging that because of she

-19-

and her husband's particular child-care schedule, this prohibition effectively prevented her from working any overtime during these two months.  (Pl.'s Statement of Material Facts ¶¶ 103-04.)

Denials of the opportunity to work overtime generally are deemed adverse employment actions, since they directly affect an employee's compensation.  See Bass, 256 F.3d at 1118.  In this case, however, Plaintiff was not denied the opportunity to work overtime -- she simply was denied the opportunity to work the overtime shift of her choice.  It is undisputed that if Plaintiff wished to work overtime, she was permitted to do so, albeit on a shift which was less convenient for her family's child-care schedule.  This alleged inconvenience is not sufficient to demonstrate Wheeler's prohibition impacted an important condition of her employment, especially since Plaintiff fails to submit evidence regarding the increased child-care costs, if any, resulting from this change in potential overtime shifts.  See Graham v. Fla. Dept. of Corr., 1 F. Supp. 2d 1445, 1450 (M.D. Fla. 1998) (finding employee's unsupported allegation that her reassignment caused "hardship on her and her family" insufficient to establish that reassignment was an adverse employment action under Title VII).

c.    *Alleged Ultimate Employment Actions*

Plaintiff argues that her January 2004 reassignment from the day shift to the night shift, which she characterizes as a transfer, constituted an adverse employment action.  (Pl.'s Opp'n to Mot. for Summ. J. at 9.)  "[A] transfer to a less desireable position in terms of pay or eligibility for pay increases is an adverse employment action because it is equivalent to a demotion."  <u>Akins</u>, 420 F.3d at 1301.  There is no evidence that Plaintiff's reassignment/transfer resulted in a decrease in pay or eligibility for pay increases, a loss of prestige, or a change in her work duties.  Although Plaintiff alleges in her brief that the night shift was "less desirable," (Pl.'s Opp'n to Mot. for Summ. J. at 9), this vague and unsupported allegation is insufficient to establish that her reassignment to the night shift negatively impacted an important condition of her employment.  <u>See</u> <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1239, 1244 (11th Cir. 2001) (holding that when a work assignment involves no serious and material change in the terms, conditions, or privileges of employment, a court should not act as "a super-personnel department" by second-guessing an employer's business judgment about where it assigns employees, reasoning that "[a] contrary view would potentially open the door to a wide variety of unfair work assignment claims that should not be litigated

in the federal courts.").  Accordingly, the Court finds that Plaintiff's January 2004 reassignment to the night shift does not constitute an adverse employment action.

Plaintiff also alleges she suffered an adverse employment action in the form of a constructive discharge.  (Pl.'s Opp'n to Mot. for Summ. J. at 11-13.) "Constructive discharge negatively affects an employee's job status, and therefore constitutes an adverse employment action." Akins, 420 F.3d at 1301-02 (citing Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994)).  "To prove constructive discharge, [a plaintiff] must demonstrate that working conditions were so intolerable that reasonable persons in their position would have felt compelled to resign." Akins, 420 F.3d at 1302 (citing Durley v. APAC, Inc., 236 F.3d 651, 658 (11th Cir. 2000)).  "[F]or a constructive discharge claim to present a jury issue and thereby survive summary judgment, the plaintiff must produce substantial evidence that conditions were intolerable." Akins, 420 F.3d at 1302 (citing Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002)).  See generally Akins, 420 F.3d at 1302 (finding jury issue with respect to constructive discharge where the employer stripped employees of job duties, excluded them from meetings, instructed their co-workers not to speak with them, subjected them to certain job requirements not imposed on other employees, and

accused one of the employees of engaging in illegal behavior in performance of her

job duties); <u>Poole v. Country Club of Columbus, Inc.</u>, 129 F.3d 551, 553 (11th

Cir. 1997) (finding jury issue with respect to constructive discharge where

employee was "[s]tripped of all responsibility, given only a chair and no desk, and

isolated from conversations with other workers").

     Plaintiff fails to produce substantial evidence that the conditions of her

employment were so intolerable that a reasonable person in her position would have

felt compelled to resign.  Plaintiff argues that she resigned from the Bureau because

she "realiz[ed] that she had no opportunities for advancement within the Bureau and

that she would likely continue to be disciplined each and every time her manag[ers]

found an opportunity to do so . . . ."  (<u>Id.</u> at 11.)  In support of her constructive-

discharge claim, she relies on the same conduct she alleges constituted adverse

employment actions taken in retaliation for her protected speech.  This conduct

involved written and oral reprimands, as well as delayed or denied opportunities for

outside employment or additional on-the-job training, stretched over the course of

thirty-three months of employment.  Unlike the employees in <u>Akins</u> and <u>Poole</u>,

Plaintiff did not offer evidence that she was stripped of her work duties or benefits,

subjected to humiliating or unfairly physically challenging work conditions.  Instead,

her allegations essentially amount to a claim that her job performance was closely

scrutinized and that this scrutiny resulted in several written reprimands and other

non-ultimate personnel actions which she believed to be unfair.  Simply put,

Plaintiff's subjective frustration with what she perceived as an inability to advance

within the Bureau is not sufficient to demonstrate that her working conditions were

so intolerable that a reasonable person would feel compelled to resign rather than

continue employment.  Accordingly, the Court finds that she did not suffer an

adverse employment action in the form of a constructive discharge.

2.    <u>Flynn and Rogers as Decisionmakers</u>

Defendants also argue that Flynn and Rogers are entitled to summary

judgment because neither of them took any adverse employment action against

Plaintiff.  (Defs.' Mot. for Summ. J. at 14.)  Plaintiff does not dispute that Wheeler

was the decisionmaker with respect to the September and December 2003 letters of

reprimand, the denial of compensation for CPR classes, and the decision not to

select Plaintiff as an EMD instructor.  In addition, Plaintiff does not allege that

Flynn or Rogers participated in the decision not to select her as a CPR instructor.

Although she contends that Flynn and Rogers were decisionmakers with respect to

a number of the negative performance commentary issued during Wheeler's military

-24-

leave of absence, the Court already has concluded that these actions do not

constitute adverse employment actions.  Accordingly, summary judgment is

warranted on Plaintiff's claims against Flynn and Rogers.[4]

        3.       The Pickering Analysis

Having concluded that Plaintiff suffered adverse employment actions in the

form of Defendants' failure to compensate her for CPR classes she taught in

August and September 2003, the September and December 2003 letters of

reprimand, and Defendants' failure to select her as a CPR or EMD instructor in the

summer of 2004, the Court must now determine if a jury issue exists with respect to

---

[4]  In support of their argument for summary judgment on Plaintiff's claims
against Flynn and Rogers, Defendants cite the Court to Mandel v. Doe, 888 F.2d
783 (11th Cir. 1989), for the proposition that "[l]iability may only attach for
decisions of county officials who 'possess the authority and responsibility for
establishing final policy with respect to the issuing question.'"  (Defs.' Mot. for
Summ. J. at 14) (citing Mandel, 888 F.2d at 792-93).  Mandel addresses under what
circumstances a government employee's conduct may impute liability to a
municipality, and is not relevant here.  The appropriate inquiry, the one the Court
has undertaken, is to determine which of the Individual Defendants was the
decisionmaker with respect to the adverse employment actions at issue.  See Quinn
v. Monroe County, 330 F.3d 1320, 1326 (11th Cir. 2003) (holding that district
court erred in conflating the "final policymaker" inquiry under Mandel with the
"decisionmaker" inquiry:  "The 'final policymaker' inquiry addresses who takes
actions that may cause the municipality . . . to be held liable for a custom or policy.
The "decisionmaker" inquiry addresses who has the power to make official
decisions and, thus, be held individually liable.").

whether these actions were taken in retaliation for Plaintiff's speech on a matter of public concern.  See Stavropoulos, 361 F.3d at 618.  In the Eleventh Circuit, courts analyze First-Amendment retaliation claims using the four-step analysis set forth in Pickering v. Board of Education, 391 U.S. 563 (1968), and Bryson v. City of Waycross, 888 F.2d 1562 (11th Cir. 1989).  See Cook v. Gwinnett County Sch. Dist., 414 F.3d 1313, 1318 (11th Cir. 2005).  "To prevail under this analysis, an employee must show that:  (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action."  Cook, 414 F.3d at 1318 (citing Bryson, 888 F.2d at 1565-66).  "If an employee satisfies her burden on the first three steps, the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech."  Cook, 414 F.3d at 1318.[5]  "The first two steps are questions of law; the final two steps are 'questions of fact designed to determine whether the

_____

[5]  This fourth step is also known as the Mount Healthy defense, referring to the Supreme Court decision from which the defense is derived.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977).

alleged adverse employment action was in retaliation for the protected speech.'"
Id. (citing Anderson v. Burke County, Ga., 239 F.3d 1216, 1219-20 (11th Cir.
2001)).

Defendants concede, as they must, that the Thompson Letter and its
statements concerning alleged understaffing in the Bureau constituted speech
involving a matter of public concern.  (Defs.' Mot. for Summ. J. at 17.)  See
generally Cook, 57 F.3d at 1319 ("A public employee's speech involves a matter of
public concern if it can 'be fairly considered as relating to any matter of political,
social, or other concern to the community.'") (citations omitted).  They argue that
summary judgment is warranted because Plaintiff's claims fail to satisfy the final
two steps of the Pickering analysis.  Specifically, they argue that (1) Plaintiff cannot
demonstrate that the other adverse employment actions at issue here were taken
against her in retaliation for her protected speech (Defs.' Mot. for Summ. J. at 20-
23); and (2) even if she could demonstrate causation with respect to these actions,
Defendants would have taken these same actions against her in the absence of her
constitutionally protected speech (Id. at 23-24).[6]

───────────────────

        [6] Defendants further argue that summary judgment is warranted because,
with respect to the February 2003 CIR, Plaintiff cannot demonstrate that her free

a.    *Causation*

To avoid summary judgment on her First Amendment retaliation claims, Plaintiff must produce enough evidence for a reasonable jury to conclude that her protected speech was a substantial or motivating factor in Defendants' alleged adverse employment actions.  See Gattis v. Brice, 136 F.3d 724, 726 (11th Cir. 1998).  "The record as a whole should be examined to determine whether a plaintiff has met his burden of showing that the protected conduct was a substantial or

---

speech interests outweighed Defendants' interests in effective and efficient fulfillment of its responsibilities.  (Defs.' Mot. for Summ. J. at 18-20.)  The Court already has concluded that Plaintiff's February 2003 CIR regarding the Thompson Letter did not constitute an adverse employment action.  See Section II(B)(1)(a), supra.  The Court further finds that, even if it did, Defendants are entitled to summary judgment with respect to the February 2003 CIR because Plaintiff cannot demonstrate that her free-speech interests outweighed Defendants' interests in requiring employees to respect the chain of command for these types of communications.  When evaluating the government's interest in the efficient provision of public services, the court considers "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made."  Bryson, 888 F.2d at 1567.  Here, Defendants' response to Plaintiff's letter acknowledged Plaintiff's concerns and stated their intention to work to correct any staffing issues.  They did not prohibit Plaintiff from voicing her concerns, nor did they punish her for the content of her speech.  Plaintiff merely was advised that she should pursue such communication in a manner that complied with the Bureau's Chain of Command Policy.  Thus, the Court finds the February 2003 CIR was a measured and reasonable response to Plaintiff's violation of Bureau policy.

motivating factor in a government employment decision."  Stanley v. City of

Dalton, Ga., 219 F.3d 1280, 1291 (11th Cir. 2000).  Although the Eleventh Circuit

has stated that "[i]t is neither possible nor desirable to fashion a single standard for

determining when an employee has met [this] initial burden," Beckwith v. City of

Daytona Beach Shores, 58 F.3d 1554, 1564 (11th Cir. 1995), it is clear that "the

plaintiff's burden in this regard is not a heavy one." Stanley, 219 F.3d at 1291.

Indeed, "[p]urely circumstantial evidence, taken in the light most favorable to the

plaintiff, can create a jury question on the issue of the government's motive."

Beckwith, 58 F.3d at 1565.

  In conducting this examination, courts consider several factors relevant:  (1)

the temporal proximity of the adverse employment action and the constitutionally

protected speech; (2) whether any asserted reasons for the adverse employment

action were shown to be pretextual; (3) any comments made, or actions taken, by

the employer indicating that the adverse employment action was related to the

protected speech; (4) whether the asserted reason for the adverse employment

action ever varied; (5) and circumstantial evidence of causation, "including such

facts as who initiated any internal investigations or termination proceedings, whether

there was any evidence of hostility to the speech in question, or whether the

employer had a motive to retaliate."  <u>Stanley</u>, 219 F.3d at 1291 n.20.  "There is no

one factor that is outcome determinative, but all factors must be taken into

account."  <u>Id.</u>

Plaintiff here has submitted sufficient evidence for a reasonable jury to

conclude that her protected speech was a substantial or motivating factor in all but

one of the adverse employment actions in question.[7]  First, Plaintiff testified that in

November 2003, in response to her complaint that various employment actions

against her were retaliatory, Wheeler angrily stated to Plaintiff that "You brought

this on yourself.  If you hadn't opened your damn mouth, I wouldn't have to be

dealing with this."  (Pl. Aff. ¶ 54.)[8]  Although several of the adverse employment

_____

[7]  The exception is Defendants' alleged failure to select Plaintiff for the
position of CPR instructor in the summer of 2004.  Defendants argue, and Plaintiff
does not refute, that the decision to select another employee for this position was
made by Training Coordinator Gwen Sidwell.  (Defs.' Statement of Material Facts
¶¶ 150-54.)  Although Plaintiff alleges that this selection process did not comply
with Bureau protocol, (Pl.'s Statement of Material Facts ¶¶ 111), there is no
evidence suggesting that the Individual Defendants manipulated the selection
process or that Ms. Sidwell was tainted by the alleged retaliatory bias held by them.
Accordingly, summary judgment is warranted on Plaintiff's First-Amendment
retaliation claim with respect to this decision.

[8]  Defendants argue that this comment does not constitute evidence of a
retaliatory intent because Wheeler was referring to Plaintiff's comments regarding
former Bureau employee Danny MacDougal, not the Thompson Letter, and he was
merely indicating that if Plaintiff had not made these comments, then she would not

-30-

actions at issue occurred after Wheeler's alleged comment, his remark is strong

evidence that the alleged final decisionmaker within the Bureau harbored ill-will

toward Plaintiff because of her comments and that this ill-will was a motivating

factor in these employment decisions.  With respect to Defendants' failure to

compensate Plaintiff for the CPR classes she taught in August and September

2003, Plaintiff cited to unrefuted evidence that the stated reason for Wheeler's

decision -- a lack of prior approval -- was pretextual, including that there was no

established, uniform requirement that the Fulton County police commander provide

written pre-approval for teaching these classes, that Plaintiff did obtain prior

approval to teach the classes from one of her supervisors, Rusty Watkins, and that,

upon request, the police commander did provide written approval for these classes,

---

have been disciplined for making them.  (Defs.' Reply in Supp. of Mot. for Summ.
J. at 15.)  Defendants' argument is not supported by the record.  Wheeler testified
that he did not make the alleged comment.  (Wheeler Dep. [45] at 178.)  He
admitted to "possibly" making a comment generally indicating that, in his opinion,
Plaintiff's problems with MacDougal stemmed from her comment.  (See id. at 176-
78.)  Plaintiff testified that Wheeler made the specific comment cited above, and
that he did so in the context of her complaint that she was being retaliated against
because of the Thompson Letter.  (Pl. Aff. ¶ 54.)  This is an issue of fact which the
jury, not the Court, must decide.  See Herzog, 193 F.3d at 1246 ("If the record
presents factual issues, the court must not decide them; it must deny the motion
and proceed to trial.").

albeit after the fact, and that other employees received compensation under similar circumstances.  (Pl.'s Statement of Material Facts ¶¶ 51-53.)  Further, with respect to Defendants' failure to select Plaintiff as an EMD instructor in the summer of 2004, Plaintiff submitted evidence that calls into doubt Defendants' stated reason for this decision, including, but not limited, to evidence suggesting that the selection process was manipulated to avoid selecting Plaintiff for the position, that Wheeler did not decide to provide EMD instruction through an outside service provider, rather than select a Bureau employee to fill the position, until after it became clear that Plaintiff was the only Bureau employee qualified for the position, and that Tonya Garrett, a Bureau employee, has been acting as a *de facto* EMD instructor, notwithstanding the Bureau's stated position that EMD instruction is provided through an outside service provider.  (Id. at ¶¶ 113-15.)  A reasonable jury reviewing this evidence could conclude that the September and December 2003 letters of reprimand, Defendants' failure to compensate Plaintiff for her CPR instruction, and failure to select her for the EMD instructor position in the summer of 2004 were in retaliation for Plaintiff's constitutionally protected speech.

Defendants argue that Plaintiff cannot demonstrate causation because (1) Wheeler did not read the Thompson Letter until after Plaintiff resigned in October

2004; (2) she admitted the conduct which resulted in her September and December 2003 letters of reprimand; and (3) the time lapse between the Thompson Letter and these adverse employment actions precludes a finding of causation. (Defs.' Mot. for Summ. J. at 20-23.) These arguments are without merit. First, although Wheeler testified that he did not read the Thompson Letter until after Plaintiff's resignation, it is unrefuted that he was made aware of the letter, and its contents, shortly after his return to the Bureau in July or August 2003. (See Pl.'s Opp'n to Mot. for Summ. J. at 26-27.) Second, that Plaintiff may have admitted the conduct for which she received the letters of reprimand does not preclude a finding that she received these formal reprimands because of her protected speech, and that without this protected speech they would not have been given. Third, the lapse of time between the Thompson Letter and the adverse employment actions here, although significantly longer than the close temporal proximity required to infer causation, does not preclude a finding of causation: "[G]aps of time, standing alone, do not preclude a plaintiff from producing enough evidence for a reasonable jury to conclude that protected speech was a substantial factor in the [employer's] decision . . . ." Stanley, 219 F.3d at 1291-92 (holding that four-year gap between protected speech and adverse employment action did not preclude the plaintiff

from establishing causation) (quoting <u>Beckwith</u>, 58 F.3d at 1567) (internal

punctuation omitted).[9]

> b.    *Same-Decision Defense*

Because Plaintiff has sustained her burden on causation, the burden now

shifts to Defendants to show by a preponderance of the evidence that they would

have made the same decisions even in the absence of the protected speech.  <u>See</u>

<u>Cook</u>, 414 F.3d at 1318; <u>see also</u> <u>Stanley</u>, 219 F.3d at 1292 (holding that an issue

of fact regarding causation does not preclude a grant of summary judgment for the

employer on the basis of  defendant still may prevail by showing that there is no

question of fact as to whether it would have taken the same action in the absence of

the speech).  "To fulfill this burden, a government employer must show that the

legitimate reason would have motivated it to make the same employment decision."

---

[9] In addition, the timeline here is not as straight-forward as Defendants
propose.  Plaintiff published the Thompson Letter on January 20, 2003.  Wheeler,
the alleged primary decisionmaker, did not return from Afghanistan until August
2003, and it is unclear from the record exactly when he learned of the letter and its
contents.  If Wheeler did not learn of the letter's contents until he returned to the
Bureau, then arguably August 2003 represents the more appropriate point from
which to measure the time between Plaintiff's protected speech and the adverse
employment actions at issue.  Using this date, the September 2003 and December
2003 letters of reprimand, and the denial of CPR-class compensation, occurred
only a few weeks or months following the protected speech.

Stanley, 219 F.3d at 1293; see also Holley v. Seminole County Sch. Dist., 755 F.2d 1492, 1505 (11th Cir. 1985) (holding that the issue under Mt. Healthy is not whether the employer had an objective reason for its decision, "but, rather, what in fact motivated the [employer] in light of [the employee's protected activity]").  The court's examination of the same-decision defense is a fact-intensive inquiry:  "[I]n evaluating summary judgment involving Bryson's fourth step, we have engaged in a case-by-case approach based upon the particular facts of each case in order to determine whether the defendant would have [taken the adverse employment action against] the plaintiff absent the protected speech."  Stanley, 219 F.3d at 1293-94.

Viewing the facts in the light most favorable to Plaintiff, and considering the strong evidence of pretext submitted by Plaintiff, the Court finds Defendants have failed to carry their burden to demonstrate that they are entitled to summary judgment under Mt. Healthy and the subsequent cases applying the defense.

### C.   Cobb County's Liability Under Section 1983

A municipality may not be found liable under § 1983 on a theory of *respondeat superior*.  Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978). A municipality is only liable under § 1983 if the alleged unconstitutional action implements an official municipal "policy" or is pursuant to a municipal "custom,"

or if the alleged unconstitutional action was taken by a final policymaker.  Wayne, 197 F.3d at 1105; Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) (holding that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances); Quinn, 330 F.3d at 1325 (same).

Plaintiff does not argue that Cobb County is liable for the Individual Defendants' alleged conduct on the basis of a policy or custom.  (See Pl.'s Opp'n to Mot. for Summ. J. at 33-36.)  She contends that Wheeler constituted a final policymaker with respect to the adverse employment actions at issue here.  (See id.)  Whether an official is one who possesses final policymaking authority is a question of law, and is decided with reference to the applicable state's law.  See Jett v. Dallas Independent School Dist., 491 U.S. 701, 737 (1989); Mandel, 888 F.2d at 792.  The court reviews state and local positive law, as well as custom or usage having the force of law, to identify those officials who have final policymaking authority for the actions alleged to have caused a constitutional violation.  See Jett, 491 U.S. at 737.

It is unclear from the evidence presently in the record whether Wheeler had final policymaking authority with respect to the adverse employment actions at issue here.  Plaintiff submitted evidence suggesting that Wheeler's determinations

-36-

are rarely, if ever, subject to actual review by others within or outside the Bureau.

(See Pl.'s Opp'n to Mot. for Summ. J. at 33-36.)  Defendants do not contest this

evidence, or even address Plaintiff's final policymaker argument.  (See generally

Defs.' Reply in Supp. of Mot. for Summ. J.)  Moreover, neither party has provided

the relevant state or local law necessary to resolve this question.  Accordingly,

considering the evidence on the question of final policymaking authority in the light

most favorable to Plaintiff, the Court finds summary judgment in favor of Cobb

County is not warranted.

### D.    Qualified Immunity for Wheeler

Defendants argue Wheeler is entitled to qualified immunity with respect to

Plaintiff's claims against him for damages.[10]  (See Defs.' Mot. for Summ. J. at 24-

---

[10]  It is well settled that qualified immunity does not protect government
employees sued in their official capacities or in their individual capacities with
respect to claims for injunctive relief.  See Rogers, 57 F.3d at 989 n.4.

26.)  "Qualified immunity offers complete protection for government officials sued

in their individual capacities if their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."

Wood v. Kesler, 323 F.3d 872, 877 (11th Cir. 2003) (citations and quotations

omitted).  "Questions of qualified immunity should be resolved at the earliest

possible stage in the litigation."  Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir.

2003) (citations and quotations omitted).

     The process for analyzing a defense of qualified immunity is well established:

> To be eligible for qualified immunity, the official must
> first establish that he was performing a "discretionary
> function" at the time the alleged violation of federal law
> occurred.  Once the official has established that he was
> engaged in a discretionary function, the plaintiff bears the
> burden of demonstrating that the official is not entitled to
> qualified immunity.  In order to demonstrate that the
> official is not entitled to qualified immunity, the plaintiff
> must show two things:  (1) that the defendant
> has committed a constitutional violation and (2) that the
> constitutional right the defendant violated was "clearly
> established" at the time he did it.

Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). Cf. Holloman v.

Harland, 370 F.3d 1252, 1278 (11th Cir. 2004) ("[W]e do not just compare the

facts of an instant case to prior cases to determine if a right is 'clearly established;'

we also assess whether the facts of the instant case fall within statements of general principle from our precedents."). Here, it is undisputed the Individual Defendants were performing discretionary functions at the time the alleged violation of federal law occurred. In addition, the Court already has concluded that a genuine dispute of material fact exists regarding whether a constitutional violation occurred. The sole issue with respect to qualified immunity is whether Defendants' alleged conduct violated a clearly established right.

Resolving this issue in the context of a First-Amendment retaliation claim requires thoughtful analysis. Generally speaking, "[t]he law is clearly established that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech." Cook, 414 F.3d at 1318 (citing Rankin v. McPherson, 483 U.S. 378, 383 (1987); Connick v. Myers, 461 U.S. 138, 140-42 (1983)). However, because the application of the Pickering analysis is so fact-specific, and because facts differ greatly from case-to-case, it is often difficult to determine whether a prior ruling provided a particular defendant with fair notice that his decision violated the law.

Having reviewed Eleventh Circuit authority on this issue, it appears to the Court that cases addressing qualified immunity in the context of a First-Amendment

retaliation claim fall into two categories.  The first category of cases involves challenged adverse employment actions taken in direct response to the constitutionally protected speech at issue -- i.e., where an employee engages in constitutionally protected speech, and the employer, claiming that the speech threatens efficiency, disciplines the employee because of this speech.  In these cases, causation is undisputed. The focus of the parties' arguments is the second step of the Pickering analysis -- the balancing test.  Qualified immunity typically is appropriate in these cases, unless the plaintiff can demonstrate that the tilt of the balance was so strongly in favor of the employee's speech that the defendants should have known that their conduct constituted unlawful retaliation:

> The Supreme Court has never established a bright-line standard for determining when the State as an employer may take action adverse to an employee in response to that employee's speech.  Instead, the Court has balanced the interest of the employee in commenting on matters of public concern against the interest of the employer in performing public services efficiently.  The court must necessarily balance these interests on a case-by-case basis.  Because of this case-by-case approach, there will rarely be a basis for an *a priori* judgment that the termination or discipline of a public employee violated "clearly established" constitutional rights.  Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case

        where the <u>Pickering</u> balancing test would lead to the
        inevitable conclusion that the adverse action was
        unlawful.

<u>Rogers v. Miller</u>, 57 F.3d 986, 989 (11th Cir. 1995) (quoting <u>Dartland v.</u>

<u>Metropolitan Dade County</u>, 866 F.2d 1321, 1323 (11th Cir. 1989)) (internal

quotations and punctuation omitted).  <u>Compare</u> <u>Rogers</u>, 57 F.3d at 991-92 (holding

the individual defendants were entitled to qualified immunity with respect to the

decision to transfer the plaintiffs because "[t]his is not a case in which the <u>Pickering</u>

balance leads to the inevitable conclusion that transferring the plaintiffs was

unlawful"), <u>with</u> <u>Cook</u>, 414 F.3d at 1320 (denying qualified immunity in a First-

Amendment retaliation case because the <u>Pickering</u> balance "tilted conclusively in

favor of [the plaintiff] such that the defendants had fair and clear warning that their

actions were unconstitutional").

       The second category of First-Amendment retaliation cases involves

allegations of indirect retaliation, i.e., where an employee alleges that his employer

took an adverse employment action against him that, although ostensibly unrelated

to the employee's constitutionally protected speech, was actually in retaliation for

such speech.  In these cases, it is typically the causation element that is in dispute.

The <u>Pickering</u> balancing test does not apply because, according to the employer,

the adverse employment action was not related to the employee's speech.  If a

genuine issue of material fact exists regarding whether the employer was motivated

by retaliatory animus when it took the alleged adverse employment action, qualified

immunity is appropriate only if the evidence undisputably indicates that the

employer was motivated, at least in part, by objectively valid reasons.  Compare

Foy v. Holston, 94 F.3d 1528, 1535 (11th Cir. 1996) (holding that, in a case

involving mixed motives, the presence of a jury issue about a defendant's improper

intent does not necessarily preclude qualified immunity:  "Where the facts assumed

for summary judgment purposes in a case involving qualified immunity show mixed

motives (lawful and unlawful motivations) and pre-existing law does not dictate that

the merits of the case must be decided in plaintiff's favor, the defendant is entitled

to immunity."), with Bogle v. McClure, 332 F.3d 1347, 1356 (11th Cir. 2003)

(denying qualified immunity under Foy because, "given the [plaintiffs'] evidence

suggesting the reorganization plan was a sham designed to cover up the race-based

transfers, a reasonable jury had reason to doubt [the employer's] asserted

nondiscriminatory reason for the transfers" and therefore, "[v]iewing the facts in the

light most favorable to the [plaintiffs], the record evidence does not undisputably

indicate that [the employer was] in fact motivated, at least in part, by objectively valid reasons.").

This case falls into the second category of cases -- alleged indirect retaliation.  Plaintiff alleges that Wheeler issued the September and December 2003 letters of reprimand, denied compensation for the CPR instruction classes she taught in August and September 2003, and did not select her for the EMD instructor position in the summer of 2004, in retaliation for the Thompson Letter. Although Defendants argue that the evidence establishes Wheeler was motivated, at least in part, by objectively valid reasons for these disciplinary measures, Plaintiff produced strong evidence of retaliatory intent.  Most notably, she testified that in November 2003, in response to Plaintiff's stated belief that various alleged adverse employment actions had been taken against her because of the Thompson Letter, Wheeler stated to her that none of the alleged actio+ns would have occurred if she "hadn't opened [her] damn mouth."  (Pl. Aff. ¶ 54.)  Viewed in the light most favorable to Plaintiff, Wheeler's comment is persuasive evidence that the adverse employment actions which occurred prior to November 2003 -- the September 2003 letter of reprimand and the denial of compensation for CPR classes -- were motivated solely by retaliatory animus.  The comment also is persuasive evidence

with respect to those adverse employment actions which occurred afterward (the December 2003 letter of reprimand and the non-selection for EMD instructor in the summer of 2004), because it reveals a significant and continuing retaliatory animus on the part of Wheeler -- the alleged decisionmaker with respect to these actions -- toward Plaintiff.  Viewing Wheeler's comment, as well as the other evidence of pretext submitted here, in the light most favorable to Plaintiff, the Court finds that the record does not undisputably indicate that Wheeler's decisions regarding Plaintiff's employment were in fact motivated, at least in part, by objectively valid reasons.  Accordingly, he is not entitled to qualified immunity at this stage of the litigation.

## III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Exceed Page Limits [35] and Defendants' Motion to Exceed Page Limits [51] are **GRANTED** *NUNC PRO TUNC*.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [27] is **GRANTED IN PART** and **DENIED IN PART**.  Defendants'

motion is **GRANTED** with respect to Plaintiff's claims for tortious interference with business relations and her claims against Flynn and Rogers.  Defendants' motion is **DENIED** with respect to Plaintiff's claims for First-Amendment retaliation against Cobb County and against Wheeler in his official and individual capacities, but these claims are limited to the September and December 2003 letters of reprimand, Defendants' failure to compensate Plaintiff for her CPR instruction, and their failure to select Plaintiff for the position of EMD instructor.


   **SO ORDERED**, this 7th day of March, 2006.

                                   _____
                                   WILLIAM S. DUFFEY, JR.
                                   UNITED STATES DISTRICT JUDGE